**NOT FOR PUBLICATION**
**POSTED ON WEBSITE**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| In re | ) Case No. 21-10753--B-7 |
| | ) |
| GUSTAVO DEL TORO, | ) |
| | ) |
| Debtor. | ) |
| | ) |
| _____ | ) |
| | ) |
| PRODUCERS LIVESTOCK MARKETING | ) |
| ASSOCIATION, | ) Adv. Proc. No. 21-1027-B |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| GUSTAVO DEL TORO, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

**MEMORANDUM DECISION**

_____

Michael J. Gomez and Garrick Warrington, FRANDZEL, ROBINS BLOOM & CSATO, L.C., Los Angeles, CA, for Producers Livestock Marketing Association, Plaintiff.

Henry D. Nunez, Fresno, CA, for GUSTAVO DEL TORO, Debtor.

_____

RENÉ LASTRETO II, Bankruptcy Judge:

**INTRODUCTION**

The Bankruptcy Code excepts from discharge debts for extensions, renewals, or refinancing of credit to the extent the debt is obtained by a materially false written statement respecting a debtor's financial condition. 11 U.S.C.

§ 523(a)(2)(B).[1] To be excepted from discharge, the creditor must have reasonably relied upon the written statements and the debtor must have intentionally deceived the creditor. The lender here relied upon an unsigned personal financial statement that was adopted by the debtor in renewing an existing loan and extending further credit. When the renewal and new credit came due, the balance was unpaid. The lender then obtained a state court judgment for the balance of the debt.

Finding all the elements necessary to except the debt from discharge, the court here rules the state court judgment is nondischargeable under § 523(a)(2)(B).

**I**

**A.**

Debtor Gustavo Del Toro ("Del Toro") operated Del Toro Dairy in Merced, California until he filed this Chapter 7 bankruptcy case in March 2021.

Producers Livestock Marketing Association ("Producers") is a Utah Agricultural Cooperative. Part of its market strategy is to enter into "Grazing/Feeding Agreements" with dairymen and other livestock ranches. Under these agreements, Producers places livestock with the "feeders." The feeders care for and utilize the livestock. The agreements last one year. During that time, Producers will remove and sell any non-essential livestock. At the end of the year, if the proceeds from the

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532. References to the record in this Memorandum are: "JPO" for Joint Pre-Trial Order, Doc. #53; "PX" for Plaintiff Exhibit; "DX" for Defendant Exhibit; "TT1" for Trial Transcript Day 1, Doc. #71; and "TT2" for Trial Transcript Day 2, Doc. #72.

sales exceed the total dollar value of the livestock placed with the feeder (including certain handling charges), the feeder receives those proceeds. On the other hand, if there is a deficit, the feeder must remit the deficit to Producers.

In late November 2015, Producers and Del Toro entered into a feeding/grazing contract. Producers placed approximately 120 head of livestock with Del Toro valued at approximately $200,000.00. PX1.

In early 2017, Producers' and Del Toro's relationship changed. By then, Del Toro owed about $181,000.00 to Producers. In February 2017, Del Toro signed a promissory note agreeing to pay Producers $181,035.75 in full by December 1, 2017. PX2.

Del Toro also signed a security agreement. PX5. Under the agreement, Del Toro pledged virtually all personal property assets including livestock, machinery, and farm equipment. JPO. Del Toro also agreed that there would be no encumbrances or sales of those assets except in the ordinary course of Del Toro's business. *Id.*

Del Toro did not make the payment when the promissory note matured in December 2017. In mid-February 2018, Matt Beechinor, the branch manager of Producers' Madera office went to Del Toro's Dairy to meet with Del Toro. Producers was then considering renewing the obligation and needed updated information to evaluate whether it would renew the obligation. PX45. Beechinor brought to the meeting the 2017 personal financial statement that Del Toro previously gave Producers, as well as a blank financial statement form. *Id.* Beechinor met with Del Toro and read the financial statement line by line while Del

Toro provided Beechinor with the information to complete the statement. *Id.* Beechinor also went through the 2017 financial statement and asked Del Toro whether the numbers or amounts had changed at all, and if so, what those new figures were. *Id.* As Del Toro provided that information, Beechinor wrote the information on the blank financial statement. *Id.* Then, Beechinor showed Del Toro the completed form and asked him to read and review it so he could verify it was correct. *Id.* Del Toro took the form, reviewed it, said it was correct, and then handed it back to Beechinor. Beechinor told Del Toro he would "type up" the financial statement and then have him sign it when any renewal documents were sent to Del Toro if a renewal was approved.[2]

After going over the financial statement with Del Toro, Beechinor then performed an inspection of the dairy, including a cow count, measurement of silage piles, a hay count, equipment inspection, and a verification of the feed and livestock. *Id.*

Beechinor prepared a typewritten financial statement. PX34. The financial statement and a renewal promissory note for $160,000.00 was prepared and sent to Del Toro. PX3. In April 2018, before the renewal promissory note was signed, Del Toro purchased 33 dairy cows from A&M Livestock for the sum of $34,389.00. DXA. Producers advanced the funds for that purchase. *Id.*[3]

---

[2] The handwritten financial statement has apparently been lost. Producers did not provide the handwritten financial statement at trial.

[3] There is substantial dispute whether Del Toro was advised by Beechinor that he had adequate credit with Producers to purchase these cows from A&M Livestock. Del Toro claims Beechinor told him he had sufficient funds to purchase additional dairy cows. DXA. Producers disputes that Beechinor so

The February 2018 financial statement reflected some liabilities including $20,000.00 in monthly payables and a $35,000.00 note payable to Nebraska State Bank for the purchase of cows. PX34. The financial statement also reflected purchase money security interests for a Mercedes vehicle and a 125 tractor. *Id.*

Based upon the 2018 financial statement and Del Toro's representations concerning his financial condition, Producers' president, Rick O'Brien, testified that Producers agreed to renew Del Toro's obligation. PX47. Once more based upon the 2018 financial statement and Del Toro's representations concerning his financial condition, Producers agreed to advance him another $34,389.00 so Del Toro could get more cows. *Id.*

At the end of May 2018, Del Toro sent a text to Beechinor that indicated he left the paperwork—referring to the renewal promissory note and the amendment to the promissory note—for Beechinor and asked him to pick up the documents. PX45. Del Toro signed the renewal note and the amendment. PX3, PX4. The renewal note was payable March 2019. PX3.[4] The amendment to promissory note increased the renewal note amount from $160,000.00 to $194,389.00. PX4.

When the February 2018 financial statement, March 2018 renewal promissory note, and April 2018 amendment to promissory note were presented to Del Toro, he signed the promissory note

---

advised Del Toro. But there is no dispute that Producers did advance the $34,389.00 so Del Toro could acquire additional cows. PX47.

[4] The February 2017 security agreement that Del Toro signed defined "indebtedness" as including any obligations owed Producers "whether now existing or hereafter arising, whether or not evidenced by any note . . ." PX5.

and the amendment to the promissory note. He did not sign the typewritten personal financial statement. At the same time, Del Toro owed significant debt that was not included in the financial statement.[5] That debt included approximately $187,000.00 owed Harry Habib Cattle Company, $13,777.00 to Darrold Brummel, $9,970.00 to Foster's Pump, $39,569.00 to Lester Moss, and $59,114.00 to Caterpillar Financial Services.[6] *Id.*; PX10.

On May 22, 2018, Western Milling, LLC, a feed supplier to dairies, filed a California Dairy Cattle supply lien against Del Toro. JPO. Beginning two months earlier, Del Toro began to receive notices form Pacific Gold Milk Producers, the cooperative that purchased Del Toro's milk, that his milk did not meet their quality standards. *Id.* Pacific Gold terminated their contract with Del Toro in January 2019. *Id.* These facts were not disclosed to Producers. Also undisclosed was a debt to Lester Moss and that payment to Moss was arranged through an assignment of Del Toro's milk check in March 2017.

Del Toro did not satisfy the renewed promissory note or amendment to promissory note when due on March 1, 2019. Around that time, Beechinor received information that a significant number of cows were missing from Del Toro's dairy. Beechinor visited the dairy and found the cows were gone. PX45.

During the period from May 2018 to March 2019, several significant events occurred affecting the value of Del Toro's

---

[5] There also no evidence that Del Toro ever advised Producers of the additional debt.

[6] There may have been significant other debt owed at the time of the renewal promissory note and amendment to promissory note were signed. PX44.

dairy operation, including the disappearance of between 169-279 cows that were worth between $135,198.34 and $223,197.21; seizure of 50 cows by Harry Habib worth approximately $40,000.00; and payment of $154,838.00 in milk check proceeds to other creditors, such as Hultgren Dairy who sold cows to Del Toro in June 2018. JPO. Producers was unaware of these events until after the 2018 renewal note and amendment were due.

**B.**

On March 11, 2019, Producers filed an action against Del Toro in the Merced County Superior Court. In its complaint, Producers alleged that Del Toro breached the renewed promissory note and the amendment. PX6. It also sought recovery of its personal property collateral and claimed Del Toro converted Producers' collateral. In addition to foreclosure of the security interest, Producers sought $175,814.14 plus interest, attorneys' fees, and costs. *Id.*

Del Toro did not respond to the complaint. On May 28, 2019, Producers obtained a default judgment against Del Toro in the sum of $193,804.54, including principal in the amount of $175,801.14, pre-judgment accrued interest in the amount of $13,973.35, attorneys' fees in the amount of $3,448.15, and costs in the amount of $581.90, totaling $193,804.54. PX7. The judgment further provides it would continue to accrue pre-judgment interest until entered, and then accrue interest at the post-judgment rate of 10% per annum. Producers was awarded its attorneys' fees and given a judgment for claim and delivery as to its collateral. *Id.* Since then, Producers submitted two

Memoranda of Costs to the state court reflecting attorneys' fees and costs it incurred post-judgment. PX8, PX9. As of the petition date, Producers claims it is owed $253,718.58.[7]

### C.

Del Toro filed this bankruptcy case on March 29, 2021. *See*, Case No. 21-10753-B-7 (Bankr. E.D. Cal.). Producers timely filed a complaint to determine dischargeability of debt. Compl., Doc. #1. Producers asserts claims against Del Toro under 11 U.S.C. § 523(a)(2)(A) (non-fraudulent transfer), (a)(2)(A) (fraudulent transfer), (a)(2)(B), and (a)(6) (conversion) for missing collateral, largely consisting of cattle and for being induced to renew credit by false financial information represented by Del Toro.

The first phase of the case was limited to the claims under 11 U.S.C. § 523(a)(2)(A) (non-fraudulent transfer), (a)(2)(B), and (a)(6) (conversion). In this phase, Producers seeks a judgment that Del Toro's debt to Producers is nondischargeable in the full amount of Producers' state court default judgement as well as post-judgment interest and costs.[8] Producers seeks treble damages and its attorneys' fees pursuant to Cal. Pen.

---

[7] This amount consists of principal of $175,814.14; pre-judgment interest of $13,973.35; $920.51 in additional pre-judgment interest; pre-judgment attorneys' fees of $3,448.15 and costs of $581.90; post-judgment enforcement costs of $28,062.75; additional costs of $933.00; and post-judgment interest through the bankruptcy filing date at the rate of 10% per annum less a recovery of $7,107.71.

[8] The second phase is for claims under 11 U.S.C. § 523(a)(2)(A) (fraudulent transfer) and (a)(6). In phase two, Producers seeks a judgment determining Del Toro's debt to Producers is nondischargeable in the sum of assigned milk check proceeds to other parties, the value of livestock seized by other creditors, the value of missing livestock, and Producers' attorneys' fees and costs in trying to uncover the missing assets. JPO.

Code § 496(c).

The case was tried over two days on December 8 and 9, 2022. The parties post-trial submissions were due February 28, 2023. The post-trial submissions were timely filed and the court has considered the testimony of the witnesses and the post-trial submissions. After careful consideration, the court can rule on the first phase of the litigation.

## D.

The United States District Court, Eastern District of California, has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b) because this is a civil proceeding under Title 11 of the United States Code. The District Court referred this matter to this court pursuant to 28 U.S.C. § 157(a). This is "core" proceeding under 28 U.S.C. § 157(b)(2)(I). The parties have each consented to this court's entry of a final judgment. JPO.

## II

The parties emphasized nondischargeability under 11 U.S.C. § 523(a)(2)(B) in their proof in the first phase of this litigation. Section 523(a)(2)(B) bars discharge of debts arising from a materially false statement respecting the debtor's financial condition if that statement is in writing. *Lamar, Archer & Cofrin, LLP. v. Appling*, 138 S. Ct. 1752, 1759 (2018). The court will focus the analysis on § 523(a)(2)(B).

As a general matter, when determining a debt is excepted from discharge, a bankruptcy court must construe the evidence

against the creditor and in favor of the debtor. *Mele v. Mele (In re Mele)*, 501 B.R. 357, 363 (B.A.P. 9th Cir. 2013). A creditor objecting to dischargeability of its claim bears the burden of proving, by a preponderance of the evidence, that the particular debt falls within one of the exceptions to discharge enumerated under § 523(a). *Grogan v. Garner*, 498 U.S. 279, 286-91, 111 S. Ct. 654, 659-61 (1991); *In re Lansford*, 822 F.2d 902, 904 (9th Cir. 1987) ("Burden is on the creditor to establish that each statute's prerequisite is met."). For purposes of § 523(a)(2), the debtor's intent, materiality, whether the creditor relied upon the debtor's false statements, and proximate cause are all questions of fact. *Candland v. Ins. Co. of N. Am. (In re Candland)*, 90 F.3d 1466, 1469 (9th Cir. 1996).

To prevail on an exception to discharge claim under § 523(a)(2)(B), the creditor must show: (1) it provided debtor with money, property, services, or credit based on a written representation of fact by the debtor as to the debtor's financial condition; (2) the representation was materially false; (3) the debtor knew the representation was false when made; (4) the debtor made the representation with the intention of deceiving the creditor; (5) the creditor relied on the representation; (6) the creditor's reliance was reasonable; and (7) damage proximately resulted from the representation. *Id.* at 1469; *In re Siriani*, 967 F.2d 302, 304 (9th Cir. 1992).

The court will examine those elements.

///

///

///

**A.**

Producers provided Del Toro with money, property, services, or an extension, renewal, or refinancing of credit based on a written representation respecting the debtor's financial condition.

A loan application containing information about an applicant's income constitutes a statement in writing respecting the applicant's financial condition for purposes of § 523(a)(2)(B). *See*, *Cashco Fin. Servs. v. McGee (In re McGee)*, 359 B.R. 764, 768 (B.A.P. 9th Cir. 2006). The same would be true for a personal financial statement. A statement concerns the debtor's financial condition if it has a direct relation to or impact on the debtor's overall financial status. *Lamar, Archer & Cofrin*, 138 S. Ct. at 1761.

Del Toro's February 2018 personal financial statement was intended to provide a complete report of his financial status. It set forth current assets, current liabilities, intermediate term assets and liabilities, as well as long term assets and liabilities, and contained numerous schedules where the debtor could explain the basis for the summary on the first page of the financial statement. PX34.

Del Toro argues he did not sign the final typed financial statement, so he cannot be charged with presenting it to Producers. This argument is unpersuasive. Factually, Del Toro adopted the statement. TT-1 60:18-25. A financial statement can be adopted by a debtor. *See*, *Tallant v. Kaufman (In re Tallant)*, 218 B.R. 58, 69-70 (B.A.P. 9th Cir. 1996). Beechinor testified that he went over the 2017 financial statement line by line and

asked Del Toro if there were any changes. After he completed the handwritten financial statement, Beechinor went over it with Del Toro who accepted it as accurate. Beechinor typed the financial statement and submitted it to Producers in Utah. PX34. The financial statement along with the renewed promissory note and amendment to promissory note were sent to Del Toro, which was Producers' usual practice. PX45.

The fact that the original, handwritten financial statement has been lost does not preclude proof of what was contained in the statement adopted by Del Toro. Other evidence of the content of a writing is admissible if the original is lost or destroyed, and not by the proponent acting in bad faith. Fed. R. Evid. 1004(a). No evidence was presented suggesting Producers was acting in bad faith in connection with the loss of the handwritten financial statement.

In May 2018, Del Toro sent a text to Beechinor advising him to pick up the loan documentation. Beechinor did so. TT1 162:5-10. Del Toro adopted the information contained in the typed financial statement and he used that statement to procure the renewal, as well as the further credit extension to purchase new cows. Beechinor's memory of these events was consistent even under cross-examination. On the other hand, Del Toro's memory of the events was not consistent. TT1 144:23-148:4; TT2 22:18-20.

Del Toro cites unpublished *Kilbey v. Nawrocki (In re Nawrocki)*, No. AZ-09-1221-PaDuJu, 2010 Bankr. LEXIS 3516 (B.A.P. 9th Cir. Mar. 3, 2010), to support his position that without a statement in writing, there can be no claim that the debt is nondischargeable under § 523(a)(2)(B). There, the issue was

whether attorneys' fees should be awarded against the
unsuccessful creditor who asserted the claim. *Id.* at *8. Though
a written statement is a prerequisite to liability under
§ 523(a)(2)(B), there is a written statement here: the February
19, 2018, personal financial statement. *Id.* at *16; PX34. It is
unsigned, but Del Toro adopted it. The uncontradicted testimony
is Producers relied upon it. Del Toro's citation to *Tallant* also
does not assist him. The Bankruptcy Appellate Panel there found
preparation and adoption of an unsigned profit and loss
statement at the debtor's direction was enough to constitute a
written statement. Beechinor here obtained the information from
the 2017 personal financial statement and from Del Toro, and
then reviewed the contents with him. Del Toro agreed the
information was accurate. That is no different than the written
statement prepared at the debtor's direction and subsequently
adopted in *Tallant*.

The court finds that Producers has sufficiently proven that
Del Toro obtained the financial accommodations by a written
representation of his financial condition.


**B.**

The written representation of Del Toro's financial
condition was materially false.

"A materially false statement is one which paints a
substantially untruthful picture of a financial condition by
misrepresenting information of the type which would normally
effect [*sic*] the decision to grant credit." *In re Greene*, 96
B.R. 279, 283 (B.A.P. 9th Cir. 1989). Such material falsity can

be premised upon the inclusion of false information or upon the
omission of information about a debtor's financial condition.
*Id.*; *Tallant*, 218 B.R. at 71. Significant misrepresentations of
financial condition—on the order of several hundred thousand
dollars—are of the type which would generally affect a lender's
or guarantor's decision. *Candland*, 90 F.3d at 1470.

Plaintiff's expert, Robert Bennett, a former agricultural
loan officer with considerable experience in lending decisions
and special assets, concluded that the financial statement
adopted by Del Toro was materially misleading to Producers such
that Producers could not make a valid credit decision. PX44.
Nearly $310,000.00 of debt was undisclosed in February 2018 and
months later when the renewal note and amendment were signed.
Del Toro provided no updates as to the status of his
liabilities. That debt included a large, secured obligation owed
Harry Habib Cattle, an assignment of a portion of Del Toro's
milk check to Lester Moss for nearly six years, and debts owed
to Darrold Brummel, Foster's Pumps, and Caterpillar Financial
Services.[9] Beechinor and O'Brien each testified that neither knew
the extent of the debt until long after the note was renewed and
additional funds were advanced, and in some cases, more than a
year thereafter. PX45; PX47.

Del Toro does not challenge the materiality of the debt
omitted from the personal financial statement, nor does Del Toro
dispute that these large debts were owed. Indeed, his bankruptcy
schedules included much of that debt. PX13.

---

[9] Mr. Bennett also opined that more than $300,000.00 of additional debt
may have existed, but it was unclear when some of that debt was actually
incurred.

The court finds the omission of the debt from the personal financial statement dated February 2018 is material in rendering the statement materially false.

**C.**

Del Toro knew the financial statement was false.

Under § 523(a)(2)(B), fraudulent misrepresentation is established by showing actual knowledge of falsity of the statement or reckless disregard for its truth. *Gertsch v. Johnson & Johnson Fin. Corp. (In re Gertsch)*, 237 B.R. 160, 167 (B.A.P. 9th Cir. 1999). The bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury producing action. *Jett v. Sicroff (In re Sicroff)*, 401 F.3d 1101, 1106 (9th Cir. 2005). Failure to review documents containing false statements about a debtor's financial condition with the knowledge that those documents will be submitted to obtain money or credit, supports a finding a reckless disregard. *Merchs. Bank of Cal. v. Chai Cho Oh (In re Oh)*, 278 B.R. 844, 858 (Bankr. C.D. Cal. 2002).

When the February 2018 financial statement was prepared and the note and amendment signed months later, Del Toro was deeply in debt to Harry Habib. Further, at that time Del Toro's processors, Pacific Gold and Milk Producers, began questioning the quality of the milk produced by Del Toro's dairy.[10] Bennett testified as to the extent of debts that were outstanding.

---

[10] Eventually, the contract between Pacific Gold and Del Toro was terminated. PX28-PX30.

15

Del Toro never denied the existence of these debts. He just insisted he never misrepresented his financial condition. Del Toro said he was not asked about other debt in connection with Beechinor's preparation of the financial statement. TT1 159:22-28. Beechinor's testimony contradicts that. TT1 58:7-28, 159:22-28. On the other hand, Del Toro claims he both did and did not know what he was signing. TT1 148:18-24. The bankruptcy schedules themselves prove Del Toro knew about the debt and the debt was not included in the personal financial statement. Del Toro admitted he discussed his Producer's debt with Beechinor at the face-to-face meeting in early 2018. DXA.

Given the extent of the debt and Del Toro's lack of credible testimony disputing his knowledge of the debt outstanding when the personal financial statement was prepared and note and amendment signed, the court finds Del Toro knew the personal financial statement was false, or alternatively, he failed to review the documents, which support a finding of reckless disregard and establishes proof of this element.

**D.**

Del Toro made the false statements with the intention of deceiving Producers.

In the Ninth Circuit, reckless disregard for the truth of a representation or reckless indifference to the debtor's actual circumstances can support a finding of intent for purpose of § 523(a)(2). *See*, *Anastas v. Am. Sav. Bank (In re Anastas)* 94 F.3d. 1280, 1286 (9th Cir. 1996); *Gertsch*, 237 B.R. at 167-168. Intent to deceive can be inferred from the totality of the

circumstances including reckless disregard for the truth. *Id.*

Del Toro certainly knew in early 2018 that Producers was considering renewing the $160,000.00 obligation carrying over from 2017. Beechinor testified he discussed this with Del Toro. In addition, Del Toro wanted to purchase additional cows. And though it is disputed by Del Toro that a further loan extension was necessary to purchase those cows, Del Toro does not dispute he signed the amendment to the promissory note. That amendment contained a recital that the loan was currently overdrawn by the amount of $34,389.00 as a result of the purchase 33 head of springer heifers. PX4. Del Toro acknowledged by signing the amendment to the promissory note the recitals were true and correct. *Id.* So, he knew not only that there was a loan commitment overdue, but acknowledged he was overdrawn. There was no dispute the personal financial statement was submitted to Producers in connection with Del Toro's request for not only a renewal but additional funds.

Further, the 2017 security agreement established the extent of the interest Producers was claiming in Del Toro's property as collateral. PX5.

Del Toro argues the 2017 security agreement could not be relied upon by Producers because the security agreement completely changed the relationship between Del Toro and Produces, which existed since 2015. Del Toro claims he was not aware of the provisions that the collateral had to be free and clear of liens because he was not given a copy of the security agreement after he signed it. This argument makes no sense. Del Toro admitted he signed it and that it is binding on him. TT2

17

9:13-14; JPO. But he also made a statement in his trial
submissions where he somehow remembered a UCC-1 would be filed
as part of the security agreement. DXA. Del Toro himself
testified he met with a Producers' representative in front of
the dairy and "we went over this stuff here and signed it off."
TT2 10:3-7. "This stuff" must have been the 2017 security
agreement. Del Toro signing the security agreement establishes
he knew, or could easily know, its contents.

Del Toro next argues he already had the loan in place in
early 2018, so he did not falsely represent his financial
condition with the intention of deceiving anyone. He continues
he did not need to deceive anyone to get the loan. This is not a
credible argument.

First, he does not explain Producers' extension of
additional credit in excess of $34,000.00 in early 2018, so Del
Toro could purchase additional cows.

Second, Del Toro's testimony at trial is inconsistent
regarding when he saw or did not see the personal financial
statement. TT1 156:22-25, 157:7-9, :15-18.

Third, on the simple issue of whether it was either Messrs.
O'Brien or Beechinor who allegedly told Del Toro that he had
funds sufficient to purchase the cows, he continued to
equivocate. In his trial declaration, Del Toro said it was
Beechinor who allegedly told him there were funds available to
purchase cows. DXA. On redirect examination by his counsel, he
said it was O'Brien who told him he had the extra funds. Then on
cross-examination, he testified it was Beechinor, not O'Brien,
who said he had additional funds. The equivocation further

1  supports a direct intent to deceive Producers, or a reckless
2  disregard of the same.

3       Debtor's reliance on *In re Evangelista*, 76 B.R. 911 (Bankr.
4  N.D.N.Y. 1984), is misplaced. The court there relied on a bank's
5  failure to directly discuss previous collateral encumbrances
6  with a debtor when loan documentation was signed as persuasive
7  of no intent to deceive. *Id.* at 914. That is not the case here.
8  Another major problem with the *Evangelista* decision is that it
9  applied a clear and convincing evidence standard. *Id.* at 913.
10 *Evangelista* predates by seven years *Grogan*, where the Supreme
11 Court established a preponderance of evidence standard.

12      The court finds there is a preponderance of evidence
13 supporting the fact that the debtor made the misrepresentations
14 contained in the personal financial statement with the intention
15 of deceiving Producers.

16

17                              **E.**

18      Producers relied on the 2018 financial statement and Del
19 Toro's representations concerning his financial condition. That
20 reliance was reasonable.

21      O'Brien, Producers' president, testified Producers agreed
22 to renew Del Toro's obligation in reliance on the 2018 financial
23 statement and Del Toro's representations concerning his
24 financial condition. PX47. He also testified, without
25 contradiction, that based upon the 2018 financial statement and
26 Del Toro's representations, Producers agreed to advance another
27 $34,389.00 to Del Toro so he could acquire more cows. *Id.*

28      To meet the reliance standard under § 523(a)(2)(B), the

reliance must be reasonable. Reasonable reliance means reliance that would have been reasonable to a hypothetical average person. *Heritage Pac. Fin. LLC v. Machuca (In re Machuca)*, 483 B.R. 726, 736 (B.A.P. 9th Cir. 2012). Reasonable reliance is judged in light of the totality of the circumstances on a case-by-case basis. *Id.* at 736.

A creditor's reliance may be reasonable if the creditor adhered to its normal business practices. *Gertsch*, 237 B.R. at 172. The court may consider whether the lender's normal practices align with industry standards, or if any "red flags" exist that would alert a reasonably prudent lender to consider whether the representations relied on were inaccurate. *Ins. Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1117 (3d Cir. 1995). If "red flags" exist, the creditor must support reasonable reliance with evidence explaining why it was reasonable for it to rely on the statements notwithstanding the "red flags." *Machuca*, 483 B.R. at 736-37. However, when the evidence shows materially false statements were made by the debtor, little investigation is required by the creditor to have reasonably relied on the debtor's representation. *Gertsch*, 237 B.R. at 170.

Among the evidence offered by Producers establishing reasonable reliance is that Producers and Del Toro had a relationship since 2015. When the security agreement was signed in 2017, it extended to all personal property assets.[11] PX5. The 2017 promissory note was in the principal sum of $181,035.75.

---

[11] The court has already found that Del Toro's testimony concerning the security agreement was not credible.

PX2. The amount of the renewal promissory note signed by Del Toro in May 2018 had been reduced by more than $20,000.00. So, through payments or otherwise, Del Toro had reduced the principal by more than $20,000.00 in less than one year.

In addition, a UCC report dated January 2018 showed various perfected liens on equipment. DXB. The only existing UCC-1, which had not lapsed covering other collateral, was in favor of Nebraska State Bank.[12] Further, when Beechinor visited Del Toro in February 2018, he conducted a cow count, silage measurement, hay count, and verification of feed and livestock numbers. PX45.

The court rejects Del Toro's argument that when the 2017 promissory note was negotiated, Producers knew that Del Toro was a credit risk. O'Brien testified of certain risks in financing livestock. TT1 107:21-22. Under cross examination, O'Brien explained that when a borrower is on extension, the lending decision may be made without tax returns or profit and loss statements. TT1 109:20-25.

Also, Bennett, Producers' expert, testified that Producers' due diligence was objectively reasonable prior to the renewal and extension of new credit. PX44; PX10; TT1 33:9-13. He also testified that he reviewed Producers' internal credit writeup showing the information was in the financial statement. TT1 35:22-25.

Even more to the point, Del Toro presented no evidence that the existence of the undisclosed debt was readily discoverable by Producers at the time of the renewal and further credit

---

[12] Producers never disputed that they were aware of Nebraska State Bank's interest.

extension.

The court finds Producers relied on the February 2018 financial statement and the representations concerning Del Toro's financial status. The court further finds the reliance was reasonable.

**F.**

Producers suffered damages proximately resulting from Del Toro's misrepresentation. The analysis of proximately caused damages here requires two different considerations.

First, the extension of new monies by Producers in 2018 totaling $34,389.00. For new money loans, proximate cause is established when the falsehoods are material and involve significant amounts of money. *Candland*, 90 F.3d at 1471. Here, the falsehoods involved are well into the six figures, which is a significant amount of money. The amount involved is comparable to *Candland*. The materiality of the misrepresentation has already been discussed above.

Second, the $160,000.00 renewal in early 2018 must be separately analyzed. In *Siriani*, the 9th Circuit held in the case of credit renewals, "a creditor seeking nondischargeability under § 523(a)(2)(B) must show that it had valuable collection remedies at the time it agreed to renew its commitment to the debtor, and that those remedies later became worthless." *Siriani*, 967 F.2d at 305. Notwithstanding that requirement, bankruptcy courts are not required to "divine what might have happened" with respect to the creditor's diligence, or lack thereof, in exercising its collection remedies. *Id.* at 306.

The 2017 security agreement gave Producers valuable collection remedies. PX5. Those remedies include the right to enforce its security interest in any or all collateral pursuant to the Uniform Commercial Code. *Id.* It could seek the appointment of a receiver to take possession of the collateral. *Id.* Producers could use, sell, or dispose of the collateral, as well as exercise other remedies. *Id.* § 6. Unfortunately, those remedies became virtually worthless by the time the renewal came due in March 2019. Approximately 50 head of cattle were repossessed by Habib Cattle Company in February 2019. Howell Test.*;* PX46. The value of those cows was approximately $40,000.00. *Id.* Approximately $68,000.00 worth of livestock was culled from Del Toro's herd in 2019. *Id.* During 2019, the total livestock leaving the herd, other than those removed by Habib Cattle Company, were valued between $135,000.00, $198,034.00, and $223,197.21. *Id.* Further, there was uncontradicted evidence that over $124,000.00 in proceeds from Del Toro's milk check were paid to Lester Moss and the Hultgrens during 2018. PX42, PX43.

Beechinor testified of learning from Nebraska State Bank, in March 2019, that a significant number of cows were missing from the Del Toro dairy and had essentially disappeared overnight. PX45. Producers did not learn until at least March 2019, after the maturity date had passed, that Del Toro had given a security interest in livestock to Harry Habib and had assigned the milk checks to third parties.[13]

---

[13] Apparently, the reason Harry Habib's UCC-1 did not appear on the UCC Report is that the UCC was prepared without an accurate surname for Mr. Del Toro. DXB; PX15.

1    Both Bennett, Producers' lending expert, and O'Brien,
2 Producers' president, testified the 2018 personal financial
3 statement was highly inaccurate based upon the undisclosed debt.
4 The disclosure of the debt would have resulted in a different
5 lending decision. PX44; TT1 133:15-134:27. The missing livestock
6 and the undisclosed milk check assignments are proximately
7 caused damages beyond the unpaid debt.

8    Del Toro's argument that Producers' filing of a UCC-1 or
9 branding of cattle would have mitigated their losses is
10 unpersuasive. Del Toro sold or otherwise removed cattle from his
11 dairy after Habib and Nebraska State Bank filed their UCC-1
12 statements. There is no evidence that the filing of a UCC-1
13 would have prevented the removal of the livestock or the loss of
14 proceeds due to the milk check assignments. Further, under
15 *Siriani*, it is not necessary for the bankruptcy court to
16 speculate as to what would have occurred had Producers filed a
17 UCC-1 financing statement or branded the livestock. *Siriani*, 967
18 F.2d at 306. Between the livestock loss and the milk check
19 assignments, there is more than enough value in Producers'
20 collateral to satisfy a $160,000.00 renewal in May 2018.

21    The court finds Producers' damages were proximately caused
22 by the false information contained in the February 2018 personal
23 financial statement.

24

25                              **G.**

26    Producers seeks treble damages against Del Toro under Cal.
27 Pen. Code § 496(c). The court declines to order such relief.
28    Pen. Code § 496(a) prohibits knowingly concealing or

                              24

withholding stolen property. *See*, *Verdugo-Gonzalez v. Holder*, 581 F.3d 1059, 1061 (9th Cir. 2009). Those injured by a violation may bring an action for treble damages, plus costs and attorneys' fees. Pen. Code § 496(c). Producers holds a prepetition judgment against Del Toro for the balance owed on its renewed promissory note and extension of new funds.

Since the state court adjudicated the debt, the only issue before this court is whether the debt was dischargeable. With an existing valid state court judgment, the bankruptcy court should not issue a new judgment. *Hamilton v. Elite of L.A., Inc. (In re Hamilton)*, 584 B.R. 310, 322-24 (B.A.P. 9th Cir. 2018), *aff'd*, 785 F. Appx. 438 (9th Cir. 2019). The court's judgment here deems the Merced County Superior Court's judgment to be nondischargeable.

That said, the other aspects of the judgment, including attorneys' fees and accrual of interest at the state rate, are appropriate damages accruing. *Shoen v. Schoen*, 176 F.3d 1150, 1166 (9th Cir. 1999); *see also*, *Sasson v. Sokoloff (In re Sasson)*, 424 F.3d 864, 874 (9th Cir. 2005) (although a bankruptcy court has jurisdiction to enter a new money judgment, recognizing "the existence of a prior judgment may introduce some prudential concerns, such as comity, that a bankruptcy court should take into consideration in fashioning relief."); *Smith v. Lachter (In re Smith)*, 242 B.R. 694, 703 (B.A.P. 9th Cir. 1999) ("[I]t follows that a separate judgment is not necessary when the claim has already been reduced to judgment by another court of competent jurisdiction."). The court here is not entering a new money judgment but merely a judgment deeming

the state court judgment to be nondischargeable. Accordingly, the court is not going to eliminate, reduce, or augment any of the components of the Merced Superior Court judgment.

## CONCLUSION

For the foregoing reasons, judgment shall be entered in favor of Producers Livestock Marketing Association and against Gustavo Del Toro, by which the state court judgment rendered by the Merced County Superior Court on May 28, 2019 in Case No. 19-CV-01019 is nondischargeable under 11 U.S.C. § 523(a)(2)(B). Counsel for Producers shall prepare a judgment in conformance with this ruling. Any claim for attorneys' fees shall be brought before the court under Fed. R. Civ. P. 54, *as applicable under Fed. R. Bankr. P. 7054.* Should any fees be awarded, an amended judgment shall be prepared as ordered.

**Dated:** Mar 28, 2023              **By the Court**

**René Lastreto II, Judge**
**United States Bankruptcy Court**

**Instructions to Clerk of Court**
**Service List - Not Part of Order/Judgment**

    The Clerk of Court is instructed to send the Order/Judgment
or other court generated document transmitted herewith to the
parties below. The Clerk of Court will send the Order via the
BNC or, if checked ___, via the U.S. mail.

Gustavo Del Toro
2274 Dickenson Ferry Rd
Merced CA 95341

Henry D. Nunez
4478 W Spaatz Ave
Fresno CA 93722

Michael J. Gomez
1000 Wilshire Boulevard, 19th Floor
Los Angeles CA 90017

Garrick Warrington
1000 Wilshire Blvd 19th Floor
Los Angeles CA 90017